UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CURRIER, MCCABE & ASSOCIATES, INC. d/b/a CMA Consulting Services,<br><br>*Plaintiff/Counter-Defendant*<br>v.<br><br>PUBLIC CONSULTING GROUP, INC.,<br><br>*Defendant/Counter-Plaintiff.* | No. 1:13-cv-00729-GLS-RFT |

**PUBLIC CONSULTING GROUP INC.'S ANSWER,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendant/Counter-Plaintiff Public Consulting Group, Inc. ("PCG") hereby answers and states its affirmative defenses to the surviving counts of Plaintiff/Counter-Defendant's Currier, McCabe & Associates' ("CMA's") complaint, and alleges counterclaims pursuant to Federal Rule of Civil Procedure 13(a), below.

**ANSWER**

Defendant PCG hereby answers those portions of the Complaint filed by Plaintiff CMA as to which PCG's Motion To Dismiss were denied. To the extent a response below does not specifically address any allegation within a given paragraph, such allegation is denied. PCG reserves the right to amend or supplement this Answer to the extent it deems it necessary or appropriate to do so during the course of these proceedings.

1. Admitted.

2. Admitted that venue is proper. PCG lacks knowledge or information sufficient to admit or deny the allegations in this paragraph relating to CMA. Denied as to the remainder.

3. PCG lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.

4. Admitted.

5. Denied.

6. Denied.  PCG refers to the actual language of the Teaming Agreement attached hereto as Exhibit 1.

7. Denied that the Teaming Agreement provided "CMA was to be a subcontractor." Admitted as to the remainder.

8. Denied

9. Admitted that PCG made a proposal to DOH.  Denied as to the remainder.

10. Admitted that PCG was awarded a contract.  Denied as to the remainder.

11. Denied.

## FIRST CAUSE OF ACTION

12. PCG refers to its responses to paragraphs 1 through 11, above.

13. Denied.

14. Denied.

15. Denied.

16. Denied.

## THIRD CAUSE OF ACTION[1]

26. PCG refers to its responses to paragraphs 1 through 16, above.

27. Denied.

28. Denied.

29. Denied.

---

[1] By Order dated March 7, 2014, the Court granted PCG's Motion To Dismiss CMA's claim of fraudulent inducement, which was CMA's Second Cause of Action in its complaint.  To the extent any further response to CMA's dismissed claim is expected here, the allegations in CMA's dismissed Third Cause of Action are denied.

30. Denied.

## FOURTH CAUSE OF ACTION

31. PCG refers to its responses to paragraphs 1 through 16 and 26 through 30, above.

32. Denied.

33. Denied.

34. Denied.

Wherefore clause:   Denied.

## AFFIRMATIVE DEFENSES

PCG hereby incorporates its answer and its counterclaims in support of the affirmative defenses listed below.

## FIRST AFFIRMATIVE DEFENSE

CMA's claims are barred by accord and satisfaction.

## SECOND AFFIRMATIVE DEFENSE

CMA is estopped from pursuing its claims due to its own misconduct and misrepresentations.

## THIRD AFFIRMATIVE DEFENSE

CMA's claims are barred by failure of consideration, as PCG received nothing of value from CMA in exchange for entering the Teaming Agreement.

## FOURTH AFFIRMATIVE DEFENSE

CMA's claims are barred by fraud.  As alleged in more detail in PCG's Counterclaims, incorporated by reference herein, CMA, through its employees Gary Davis and Chip Barnes, stated in a February 8, 2013 phone conference with PCG employees that the NYEIS data warehouse developed by CMA for DOH was functioning to DOH's satisfaction and was then in

use by DOH. Mr. Davis and Mr. Barnes added that DOH was satisfied with CMA's performance. PCG reasonably relied on these representations in entering the Teaming Agreement with CMA and in crafting the sections of its proposal to DOH addressing the time and cost required to complete the project. After its proposal had been accepted, PCG learned from DOH that CMA's representations had been false, and that in fact the data warehouse designed by CMA as part of the NYEIS project was not functioning properly and was not in use by DOH. PCG was further informed by DOH that, contrary to CMA's assertions, DOH was frustrated and dissatisfied with CMA's prior work. Because of CMA's fraudulent representations, PCG expended money developing a functional data warehouse system to meet its obligations to DOH and lost money due to its inability to deliver 100% of the services on which payment from DOH was contingent.

## FIFTH AFFIRMATIVE DEFENSE

CMA's claims are barred by illegality.

## SIXTH AFFIRMATIVE DEFENSE

CMA's claims are barred by laches, as it unreasonably delayed in pursuing its claims, causing prejudice to PCG.

## SEVENTH AFFIRMATIVE DEFENSE

CMA's claims are barred by release.

## EIGHTH AFFIRMATIVE DEFENSE

CMA's claims depend on alleged contractual obligations that are not contained in the written Teaming Agreement between CMA and PCG or in any other written agreement, and are barred by the statute of frauds.

## NINTH AFFIRMATIVE DEFENSE

CMA's claims are barred by waiver.

## TENTH AFFIRMATIVE DEFENSE

CMA's claims are barred by its failure to mitigate its alleged damages.

## PUBLIC CONSULTING GROUP INC.'s COUNTERCLAIMS

Defendant/Counter-Claimant PCG hereby asserts counterclaims against Plaintiff/Counter-Defendant CMA as provided by Federal Rule of Civil Procedure 13(a).

## JURISDICTION

1.  The Court possesses jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332 in that there is a complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

2.  The Court also possesses jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367, as the counterclaims are so related to the claims in the action over which the Court has original jurisdiction that they form part of the same case or controversy.

## ALLEGATIONS

3.  On January 31, 2013, the New York State Department of Health, Division of Family Health, Bureau of Early Intervention (hereinafter referred to as "DOH" or the "Department") issued a request for proposals.

4.  DOH was seeking a contractor to serve as an agent of the Department, performing fiscal management and overseeing payment of claims related to the Early Intervention Program for infants and toddlers with disabilities.

5. The project required a contractor to maintain a robust data warehouse containing fiscal information and other data regarding the Early Intervention Program and to operate a call center, among other duties.

6. On February 8, 2013, PCG representatives including Michael Dieter, Marc Staubley, Paul Buckley, Nathan Grossman, and Rick Dwyer had a phone conversation with Thomas Mullen, Gary Davis, and Chip Barnes of CMA about the possibility of working together to prepare a proposal responding to the DOH request, with PCG proposed as the prime contractor and CMA proposed as a subcontractor.

7. CMA represented that it had previously worked with DOH on the development of a centralized information management system known as the New York State Early Intervention System ("NYEIS").

8. During the February 8, 2013 call, Mr. Dieter asked about CMA's working relationship with DOH and the functioning of CMA's data warehouse used to store the NYEIS data. Mr. Davis and Mr. Barnes stated that although the project had experienced some initial problems, DOH was now using the data warehouse and was satisfied with how it was performing.

9. DOH was not, however, using that data warehouse and was not satisfied with its performance at that time or thereafter. As such, the representations made by Mr. Davis and Mr. Barnes were false at the time that they were made.

10. Mr. Davis, Mr. Barnes, and the other CMA representative participating on the call knew at the time that these representations were false.

11. Because CMA represented that the data warehouse was then currently being used by DOH as a repository for data and information relating to the NYEIS program, PCG

reasonably expected that CMA's existing data warehouse contained valid, scrubbed data of good quality that PCG would be able to access and use if it became the prime contractor on the new project with CMA as a potential subcontractor.

12. Because CMA represented that it was providing a functioning data warehouse that was then in use by DOH, PCG believed that if it were awarded the prime contract and if it were able to negotiate a subcontract with CMA subsequently, it would not need to create a warehouse of early intervention data from scratch. Instead, PCG expected it would have the ability to access necessary early intervention data, including patient and provider data, directly from the existing, functioning CMA data warehouse that was purportedly already in use by DOH.

13. PCG thus reasonably anticipated significant savings in time and cost if it teamed, and then was ultimately able to enter into a subcontract, with CMA based on CMA's representations that its data warehouse was functioning to DOH's satisfaction and was in use by DOH.

14. PCG justifiably relied on CMA's misrepresentations, which were made by Mr. Davis and Mr. Barnes during the February 8, 2013 call, when deciding to enter into a "Teaming and Confidentiality Agreement" (hereinafter referred to as "Teaming Agreement") with CMA.[2]

15. PCG relied on these misrepresentations also when proposing that, should the parties successfully negotiate a subcontract, CMA could possibly participate in the project at a rate up to 20 percent of the total contract value. CMA's participation at a 20 percent rate would be possible only presuming that, among other things, CMA's data warehouse was in fact functional and then in use by DOH collecting early intervention data.

---

[2] The Teaming Agreement is attached as Exhibit 1 to these Counterclaims.

16. Based on CMA's misrepresentations that it had handled, and was at the time successfully providing, data warehousing services to DOH, that it was processing and handling the early intervention data in its data warehouse, that DOH was satisfied with CMA's data warehousing services, and that the data housed therein was of good quality, PCG believed CMA to be well suited for this potential role.

17. PCG reasonably expected that, if awarded the contract, it would be able to rely on CMA for transitional services when implementing the project based on CMA's assertions that DOH was pleased with the services, including the data warehouse and call center services, CMA was already then providing to DOH as part of the NYEIS project.

18. PCG entered the Teaming Agreement based on its belief that it received accurate information from CMA sufficient to assess the parties' complimentary capacities and to conclude that their mutual efforts in preparing a proposal would best satisfy DOH's needs.

19. The Teaming Agreement required CMA to exercise commercially reasonable efforts to assist with PCG's preparation of a proposal to DOH as reasonably requested by PCG, including the provision of accurate information about CMA's experience with DOH relevant to the proposal.

20. The Teaming Agreement required CMA to assist PCG in the preparation and support of the proposal to DOH, and it required each party to "keep the other party informed concerning all significant aspects of proposal preparation, submission, and negotiation."

21. The Teaming Agreement required that as a prerequisite to PCG negotiating or entering into any subcontract with CMA, CMA must satisfy PCG's standard requirements for subcontractors, which include, but are not limited to, the provision of accurate information on a timely basis to PCG.

22.     The Teaming Agreement required that as a prerequisite to PCG negotiating or entering into any subcontract with CMA, DOH would be required to approve of the use of CMA as a subcontractor on the project.

23.     CMA never corrected its fraudulent statements regarding its relationship with DOH or the functionality of its data warehouse.  As a result, PCG, in its proposal to DOH, touted CMA's data warehouse functionality and relied on CMA's misstatements when estimating the time and cost to complete the project and when including those estimates in its proposal.

24.     CMA also failed to inform PCG about DOH's dissatisfaction with CMA's call center performance, despite CMA knowing that DOH considered its call center performance to be unsatisfactory, and despite such information being relevant and material to PCG's preparation of the proposal.

25.     DOH announced on March 29, 2013, that PCG's proposal had been accepted.  On April 8, 2013, PCG representatives held an initial meeting with DOH employees involved in the Early Intervention project.

26.     At that meeting, PCG was stunned to learn from the New York DOH employees that, contrary to CMA's representations, DOH was not using CMA's data warehouse because it was not functioning properly and the data was unreliable.

27.     PCG was also surprised to learn that DOH was not satisfied with the performance of CMA's call center.  The DOH employees informed PCG that CMA was not meeting the call center metrics that PCG had touted in its proposal.  Prior to hearing this, PCG had expected to be able to rely on CMA's call center in fulfilling its duties to DOH.  After hearing this, PCG realized that DOH did not have confidence in CMA's ability to handle the call center responsibilities that PCG had described in its proposal.

28. The DOH employees stated that they had previously and repeatedly made their dissatisfaction with CMA's data warehouse functionality and with CMA's call center known to CMA. CMA, however, had never informed PCG of DOH's repeated expressions of dissatisfaction with CMA's performance.

29. The DOH employees informed PCG that DOH lacked confidence in CMA and that they did not think PCG needed CMA's services to perform the project.

30. CMA's misrepresentations and omissions about the status and capabilities of its data warehouse damaged PCG. Because it could not rely on CMA's data warehouse system, PCG was required to develop one from scratch, a costly project that more than tripled the time needed to achieve necessary data warehouse functionality.

31. CMA's failure to provide PCG with accurate information about the functioning of its call center work for DOH also harmed PCG because PCG relied on CMA's claimed successful past and continuing performance of those functions when drafting and pricing the proposal to DOH.

32. PCG's agreement with DOH specifies that PCG is paid according to the percentage of the deliverable achieved in a given month.

33. Because of the delays caused by CMA's misrepresentations and by CMA's failure to apprise PCG fully and accurately of the nature and quality of the work it was performing for DOH, PCG was not able to deliver 100% of its promised functionality and services to DOH within the timeframe it had proposed, and PCG suffered damages as a result.

34. Indeed, because PCG was unable to rely on CMA's data warehouse or CMA's call center, DOH put in place an interim solution, during which time PCG was compelled to spend significant time, effort, and money to create and replace the functionality that CMA had

falsely represented it had already been providing to DOH.  As a result, PCG has been paid significantly less from DOH than it would have been paid had it been able to rely on CMA's provision of services to DOH's satisfaction.

35. As a result of CMA's fraudulent conduct, which induced PCG into signing the Teaming Agreement, and as a result of CMA's failure to provide accurate information and meet its other obligations under the Teaming Agreement, PCG suffered damages in an amount to be determined at trial, but not less than $1.8 million.

36. As a result of CMA's failure to provide information to PCG and to keep PCG informed of CMA's performance and ability to perform various functions for DOH, including but not limited to its data warehouse functions and call center activities, PCG suffered damages in an amount to be determined at trial, but not less than $1.8 million.

## COUNT I
## FRAUDULENT INDUCEMENT

37. PCG realleges and incorporates paragraphs 1 through 36, above.

38. CMA, through its employees Gary Davis and Chip Barnes, stated in a February 8, 2013 phone conference with PCG employees that the NYEIS data warehouse developed by CMA's for DOH was functional and in use by DOH.  Mr. Davis and Barnes added that DOH was satisfied with CMA's performance of all tasks it was performing for DOH.

39. On February 8, 2013, and thereafter, CMA's data warehouse was not functioning properly and was not being used by DOH.

40. CMA and its agents, including Mr. Davis and Mr. Barnes, knew at the time these statements were made that they were false, because it knew that DOH was not satisfied with the quality of the data and the functionality of its data warehouse, that DOH was not using the data warehouse, and that DOH was not satisfied with the work CMA had been performing for DOH.

41. PCG reasonably relied on these false representations when entering into the Teaming Agreement with CMA.

42. PCG first learned that CMA's representations were fraudulent after its proposal had been accepted by DOH when, on April 8, 2013, DOH informed PCG that the data warehouse designed by CMA as part of the NYEIS project was not functioning properly, was not being used by DOH, and that the data contained therein was of poor quality.

43. PCG was further informed by DOH that, contrary to CMA's representations, DOH was frustrated with CMA's prior work, lacked confidence in CMA, and did not think PCG needed CMA's services as a subcontractor on the project.

44. Because of CMA's fraudulent representations, PCG had to expend time and money developing a functional data warehouse system to meet its obligations to DOH, and lost money due to its inability to deliver at the start of the project and for some months thereafter 100% of the services on which its payment from DOH was contingent.

## COUNT II
## BREACH OF CONTRACT

45. PCG realleges and incorporates paragraphs 1 through 44, above.

46. PCG entered into a Teaming Agreement with CMA in March of 2013.

47. The Teaming Agreement specified that "[e]ach party will keep the other party informed concerning all significant aspects of proposal preparation, submission, and negotiation."

48. The Teaming Agreement also required CMA to provide accurate information to PCG, including information about CMA's experience relevant to the proposal.

49. The Teaming Agreement required as a precondition to any subcontract negotiations that CMA meet all necessary requirements, including satisfying PCG's standard requirements for subcontractors and being approved by DOH to participate on the project.

50. PCG has performed all its obligations under the contract, including listing CMA as the proposed subcontractor in its proposal to DOH and keeping CMA informed throughout the proposal submission process.

51. Despite the Teaming Agreement, CMA not only failed to keep PCG informed but actively misled it by declining to correct prior misrepresentations indicating that the data warehouse it had already developed for DOH as part of the NYEIS project was functioning to DOH's satisfaction, contained quality data, and was in use by DOH.

52. CMA also failed to inform PCG about its provision of call center services in a manner not satisfactory to DOH and below the standards touted in the proposal to DOH.

53. CMA failed to keep PCG informed of the complaints it received from DOH about its ongoing performance of functions related to the NYEIS project.

54. CMA failed to meet PCG's requirements and obtain DOH's approval, which were prerequisites to PCG negotiating and entering into any subcontract with CMA.

55. Because of CMA's failure to keep PCG informed or to provide PCG with accurate information, PCG included in its proposal to DOH estimates for the cost and time required to complete the project that were predicated on CMA already having in place a functional data warehouse as part of the NYEIS project that could be leveraged for use in the new project and on CMA's ability to provide call center and related customer services in a manner satisfactory to DOH.

56. As a result, PCG was damaged when it was required to expend time and money to develop a new, functional data warehouse to meet its obligations to DOH and by not being able to rely on CMA to provide call center and customer services that met with DOH's requirements or the service level requirements stated in the proposal to DOH.

57. PCG was further damaged when it lost money due to its inability to deliver 100% of the services on which its payment from DOH was contingent.

## COUNT III
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

58. PCG realleges and incorporates paragraphs 1 through 57, above.

59. PCG entered into a Teaming Agreement with CMA in March of 2013.

60. In entering the agreement, CMA implicitly accepted an obligation to act in good faith and not to frustrate PCG's right to receive the benefit of the agreement.

61. PCG has performed all its obligations under the Teaming Agreement, including listing CMA as the proposed subcontractor in its proposal to DOH and keeping CMA informed throughout the proposal submission process. It also adhered to its implied obligation to act in good faith.

62. CMA breached its covenant of good faith and fair dealing by actively misleading PCG about the status of the data warehouse CMA developed for NYEIS and about DOH's working relationship with DOH, and by failing to correct its misrepresentations even as it knew that PCG was relying on them.

63. CMA breached its covenant of good faith and fair dealing by failing to provide accurate information to PCG about the services it was performing for DOH, including but not limited to information regarding CMA's call center, the customer service CMA was providing to DOH, and DOH's dissatisfaction with CMA's performance of those services.

14

64. Because of CMA's failure to keep it informed, PCG included in its proposal estimates for the cost and time required to complete the project that were predicated on CMA having a functional data warehouse that could be leveraged for use in the new project and on CMA being able to provide call center services in a manner satisfactory to DOH and at the service levels represented in the proposal.

65. As a result, PCG's right to receive the benefit of its agreement with CMA was frustrated, and PCG suffered damages when it was required to expend time and money to develop a new, functional data warehouse to meet its obligations to DOH and by not being able to rely on CMA to provide call center services that met with DOH's requirements or the requirements stated in PCG's proposal to DOH.

66. PCG was further damaged when it lost money due to its inability to deliver 100% of the services on which its payment from DOH was contingent.

## PRAYER FOR RELIEF

**WHEREFORE**, with respect to Counts 1, 2, and 3, PCG respectfully requests:

1. That the Court rescind the Teaming Agreement;

2. That the Court order CMA to pay PCG monetary damages in an amount to be determined at trial, but not less than $1.8 million; and

3. That the Court award punitive damages against CMA because of CMA's fraudulent conduct; and

4. That the Court award PCG all costs and expenses, including but not limited to attorney's fees, to the fullest extent available; and

5. That the Court award such other and further legal and/or equitable relief to PCG as it deems appropriate, just, necessary, and proper.

March 21, 2014                           Respectfully Submitted,


                                         By: /s/ Charles T. Kimmett
                                             Charles T. Kimmett, Bar No. 515050
                                              (CKimmett@wiltshiregrannis.com)
                                             Mark D. Davis, Bar No. 518302
                                              (MDavis@wiltshiregrannis.com)

                                             WILTSHIRE & GRANNIS LLP
                                             1200 Eighteenth Street NW, Suite 1200
                                             Washington, DC 20036
                                             (202) 730-1300 (tel)
                                             (202) 730-1301 (fax)

                                         *Counsel for Public Consulting Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2014, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

Christopher K. Mills
Mills Law Firm
1520 Crescent Road
Suite 100
Clifton Park, NY 12065
cmills@millslawny.com

/s/ Charles T. Kimmett