**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CURRIER, MCCABE &**
**ASSOCIATES, INC. d/b/a**
**CMA CONSULTING SERVICES,**

        **Plaintiff/**
        **Counterdefendant,**      **1:13-cv-729**
                           **(GLS/DJS)**

    **v.**

**PUBLIC CONSULTING GROUP, INC.,**

        **Defendant/**
        **Counterclaimant.**
_____

**APPEARANCES:**               **OF COUNSEL:**

**FOR THE PLAINTIFF/**
**COUNTERDEFENDANT:**
Mills Law Firm            CHRISTOPHER K. MILLS, ESQ.
1520 Crescent Road
Suite 100
Clifton Park, NY 12065

**FOR THE DEFENDANT/**
**COUNTERCLAIMANT:**
Harris, Wiltshire & Grannis LLP    CHARLES T. KIMMETT, ESQ.
1919 M Street NW, Eighth Floor    VARUN S. GOEL, ESQ.
Washington, DC 20036           MARK D. DAVIS, ESQ.
                             TRACI D. BISWESE, ESQ.
                             WILLIAM B. SULLIVAN, ESQ.

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff/counterdefendant Currier, McCabe & Associates, Inc. (CMA) commenced this diversity action against defendant/counterclaimant Public Consulting Group, Inc. (PCG) alleging breach of contract and other related causes of action arising from a business relationship gone awry. (*See generally* Compl., Dkt. No. 1.) After the majority of CMA's claims survived a motion to dismiss, PCG filed a counterclaim alleging breach of contract and other related causes of action against CMA. (Dkt. No. 19 at 11-15.)

Pending is CMA's motion for summary judgment, (Dkt. No. 91), and PCG's motion for summary judgment, (Dkt. No. 93). For the following reasons, CMA's motion is denied and PCG's motion is granted in part and denied in part.

## II. Background[1]

## A. Facts

### 1. The Parties

CMA is a provider of information technology services that specializes

---

[1] Unless otherwise noted, the background facts are not in dispute.

in the fields of public health and human services.  (Pl.'s Statement of Material Facts (SMF) ¶ 2, Dkt. No. 91, Attach. 2.)  CMA has developed systems integration[2] projects for several states and state agencies, including the New York State Department of Health (DOH).  (*Id.* ¶¶ 9, 11.) It is certified by the State of New York as a woman-owned business entity (WBE).  (*Id.* ¶ 1.)

PCG provides management consulting services to state, county, and municipal governments.  (Def.'s Statement of Material Facts (SMF) ¶ 2, Dkt. No. 93, Attach. 3.)

### 2.    *The New York Early Intervention System*

One of the projects that CMA partnered with DOH on, the New York Early Intervention System (NYEIS), was a centralized management system that electronically managed DOH's Early Intervention Program (EIP).  (Pl.'s SMF at ¶¶ 15-16.)  DOH's EIP provides a range of therapeutic and

---

[2] The immediate controversy is centered around systems integration.  Systems integration is a multi-staged process that consists of "designing, developing, testing[,] and implementing disparate computer systems, hardware[,] and software applications into a single, coordinated system that supports business processes, information flows, reporting[,] and data analytics."  (Pl.'s SMF ¶¶ 4, 6.)  Such projects generally consist of many components, including a repository of data received from an operational system known as a "data warehouse."  (*Id.* ¶ 7.)  Because of their complexity, systems integration projects can cost upwards of tens of millions of dollars and require years of development and implementation by highly-skilled experts.  (*Id.* ¶ 5.)

supportive services for disabled children and their families.  (*Id.* ¶ 16)  In turn, its underlying integration system supports delivery of essential services to over 70,000 people annually by coordinating financial, administration, and management services at the local and state level.  (*Id.* ¶¶ 16-17.)

State agencies often solicit professional expertise in the otherwise foreign fields of systems integration by promulgating a request for proposals (RFP).  (Def.'s SMF ¶¶ 4, 6.)  A prospective contractor's response to an RFP is a gateway to securing a state contract.  (*Id.* ¶ 80.)

### 3.    *State Fiscal Agent Request For Proposals*

In August 2012, PCG contacted CMA to discuss partnering on an RFP that DOH would soon release for a new EIP project.[3]  (Pl.'s SMF ¶ 36.)  The RFP sought a state fiscal agent (SFA) to perform the mechanics of processing payment claims for EIP services.  (Def.'s SMF ¶ 4.)  The RFP made clear that whoever was awarded the ultimate SFA contract would be expected to capitalize on DOH's prior investment in

---

[3] Prior to the immediate controversy, PCG had teamed up with CMA to pursue a contract with the New York State Department of Education, in which PCG would serve as the general contractor and CMA as the subcontractor.  (Def.'s SMF ¶ 68.)  However, for reasons that remain disputed, CMA eventually withdrew from this prior arrangement.  (*Id.* ¶ 69.)

NYEIS.  (*Id.*)  Specifically, DOH expected that non-fiscal data already in NYEIS would be used by the prospective SFA for fiscal processing on the new project.  (Def.'s SMF ¶ 5.)  Thus, the RFP made it clear to the parties that the NYEIS data warehouse was an integral component of the SFA project.  (*Id.*)  The RFP also included a goal of devoting 20% of the SFA's full contract value to minority-and-women owned-business enterprises (MWBE).  (*Id.* ¶ 79; Pl.'s SMF ¶ 45.)

Since there was an incredibly aggressive time frame between the RFP release and its legislatively-mandated start date, prospective bidders had to work expeditiously to prepare proposals—especially given the magnitude of the project.  (Pl.'s SMF ¶ 41; Def.'s SMF ¶ 7.)  As such, PCG was particularly interested in leveraging CMA's data warehouse and call centers that were already structured for NYEIS.  (Def.'s SMF ¶¶ 83, 88.)  On its end, CMA expected that the NYEIS data warehouse and call center would be part of the SFA solution.  (*Id.* ¶ 86; Pl.'s SMF ¶ 95.)  After all, both parties knew that developing a data warehouse from scratch would be much more expensive than leveraging CMA's existing NYEIS data

warehouse for use in the SFA project.[4]  (Def.'s SMF ¶ 93.)

From the onset, PCG informed CMA that it was capable of doing all of the work on the SFA project itself and "do[es] not typically partner with other companies unless [it is] forced by the regulations associated with the project[.]"  (Pl.'s SMF ¶¶ 43, 46.)  However, PCG identified CMA as a logical fit to the proposal's MWBE requirement.[5]  (*Id.* ¶ 46.)  Non-compliance with the SFA's MWBE requirement would have jeopardized PCG's ability to procure the project.  (*Id.* ¶ 54.)

During the bidding process, there was a blackout in place between DOH and bidders, except for an official question and answer platform.  (Def.'s SMF ¶¶ 8-9.)  DOH incorporated their responses to questions from potential bidders into the RFP.  (Dkt. No. 91, Attach. 55.)  One of the questions asked whether the current NYEIS vendor—CMA—would be precluded from bidding on the RFP as a subcontractor or if there would be other limitations placed on such vendor due to its current role on the

---

[4] Both parties dispute what type of data was critical to the SFA project and which specific aspects of the NYEIS project were going to be used as leverage on the SFA project.  (Def.'s SMF ¶ 88; Dkt. No. 102, Attach. 1 ¶ 88; Dkt. No. 93. Attach 9 at 79, 96, 268.)

[5] The MBWE goal was divided into two requirements:  10% WBE and 10% minority-owned business enterprise (MBE).  (Def.'s SMF ¶ 79.)  Because CMA was not a MBE, PCG expected that CMA would fulfill 10% of the WBE requirement and use another supplier to fulfill the requisite MBE percentage.  (*Id.* ¶ 77; Dkt. No. 102, Attach. 1 at ¶ 77.)

project.  (*Id.* at 5.)  DOH stated that CMA "will not be precluded and there will be no limitations related to [its] involvement."  (*Id.*)

### 4.    February 2013 Teleconference

On February 8, 2013, after the RFP release, CMA and PCG held a teleconference.  (Def.'s SMF ¶ 29.)  During the call, "CMA vouched to PCG that it had the ability to handle certain areas of NYEIS work relevant to the SFA project."  (*Id.* ¶ 34.)  Both parties knew that the ability to use the NYEIS data warehouse for the SFA project was a "core assumption" of the proposal.  (*Id.* ¶ 238.)  However, despite being aware that the NYEIS project was experiencing issues, CMA failed to share those issues with PCG.  (*Id.* ¶¶ 52-53, 205-09.)  In fact, CMA knew that the NYEIS system faced so many functionality problems that counties were pressuring DOH to allow them to suspend entry of children into NYEIS altogether.  (*Id.* ¶¶ 167-69.)  Additionally, DOH relayed its concerns with the lack of functionality of the NYEIS data warehouses in various meetings and communications with CMA before and after the RFP's release.[6]  (*Id.* ¶¶ 155,178-79, 214, 215, 218, 226.)  Instead of addressing these concerns

---

[6] CMA maintains that it is not to blame for the NYEIS problems but instead was tasked with fixing the issues it inherited from another company through bankruptcy proceedings.  (Dkt. No. 102, Attach. 1 ¶ 197.)

with PCG, CMA officials pointed out its success in developing data warehouses. (Def.'s SMF ¶ 40.)

The parties dispute whether CMA made any specific assurances to PCG regarding the use and functionality of the NYEIS data warehouses and call centers. (Def.'s SMF ¶ 53; Dkt. No. 102, Attach. 1 at ¶ 53.) However, it is clear that PCG knew about the problems affecting the NYEIS data warehouses and call centers; specifically, prior to the February teleconference, PCG officials reviewed the ongoing NYEIS issues that were cataloged in release notes. (Pl.'s SMF ¶ 76; Def.'s SMF ¶ 41.) PCG was also aware of "[NYEIS'] delays in implementation and cost overrun." (Dkt. 102, Attach. 29.)

5.    *Teaming and Confidentiality Agreement*

After the teleconference, CMA and PCG entered a Teaming and Confidentiality Agreement (TCA), to combine their specialities and respond to the RFP. (Dkt. No. 91, Attach. 25 (TCA).) The TCA divvied up duties in pursuit of securing the SFA contract: PCG was primarily "responsible for the coordination and administration of the [p]roposal effort and for the physical production and submission of the [p]roposal and for all other duties in connection with the [p]roposal," (TCA § 2(a)), while CMA's

primary duty was to "provide such assistance in the preparation and support of the [p]roposal as may be reasonably requested by PCG, including, but not limited to, providing price information, resumes, company background, personnel experience relevant to the RFP, and assistance in oral presentations," (*Id.* § 2(b)). The TCA also placed a duty on each party to "keep the other party informed concerning all significant aspects of proposal preparation, submission, and negotiations." (*Id.* § 2(c).) If DOH accepted the proposal and if CMA met subsequent conditions, PCG was to grant CMA the subcontract on the SFA contract. (*Id.* § 3(a).)

The TCA guaranteed CMA a subcontract if (1) DOH awarded a contract to PCG and (2) CMA met "all necessary requirements for a subcontract." (*Id.*) The TCA further specified these necessary requirements as "including but not limited to satisfying PCG's standard requirements for subcontractors and obtaining any necessary approval by the [p]rospective [c]lient." (*Id.*) The TCA required PCG to "exercise commercially reasonable efforts to secure CMA as a subcontractor, consistent with the [p]roposal." (*Id.*)

After entering the TCA, CMA provided PCG information related to CMA's experience developing data warehouses and call centers. (Def.'s

SMF ¶ 44.)  CMA again touted its success in developing such infrastructure and did not reference any functionality issues with the NYEIS data warehouse.  (*Id.* ¶¶ 44-47, 52.)  Additionally, CMA revised draft proposal sections related to the data warehouse and call center and responded to PCG's information requests.  (*Id.* ¶¶ 85, 87, 91.)  CMA provided manpower and cost estimates that it deemed necessary to get the SFA system up and running.  (*Id.* ¶ 107; Dkt. No. 102, Attach. 1 ¶ 85.)  Specifically, CMA provided "a cost worksheet, a data warehouse write-up, and a call center ticket write-up."[7]  (Def.'s SMF ¶ 85.)

6.    *The Proposal*

PCG included the content it received from CMA in the final proposal to DOH.  (*Id.* ¶¶ 91, 108.)  In the proposal, PCG referenced CMA's ability to provide "a call center solution on Day 1 of the" SFA project using the NYEIS call center, CMA's "successful user support systems for NYEIS," and CMA's experience in "successfully manag[ing] the transformation of the state's data warehouse."  (*Id.* ¶ 48.)  Throughout the proposal, PCG

---

[7] The parties dispute whether these figures were based on a fully-functioning NYEIS data warehouse.  (Def.'s SMF ¶ 85; Dkt. No. 102, Attach. 1 ¶ 85.)

clearly expressed its intentions to use CMA as the project's subcontractor.[8] (Dkt. No. 93, Attach. 9 at 3, 7-8, 71, 79-80, 268, 377-78.)

After careful review, DOH picked PCG's proposal to fulfill the SFA project's requirements.  (Def.'s SMF ¶ 111.)

### 7. PCG and DOH Kickoff Meeting

In April 2013, DOH and PCG officials held a kickoff meeting to discuss next steps.  (Pl.'s SMF ¶ 119.)  Although CMA was absent from this meeting, its reputation was challenged by at least one high-ranking DOH official.  (Def.'s SMF ¶¶ 111-14.)  Specifically, Bradley Hutton, the director of the Center for Community Health who supervised the NYEIS and SFA projects, shared his view that CMA's former work was less than satisfactory.  (*Id.* ¶¶ 11, 116-21.)  His negative comments addressed both the NYEIS system and its systems integrator, CMA.  (*Id.*)

Although DOH never outright expressed its disapproval with PCG using CMA as a subcontractor—even when requested to do so in writing by PCG—it certainly worked to envision an SFA contract without CMA.  (*Id.* ¶ 134; Pl.'s SMF ¶¶ 135-36.)  Most notably, PCG and DOH worked

---

[8] In fact, PCG referenced CMA no less than sixty times throughout the proposal. (Def.'s SMF ¶ 110.)

together—without CMA—to waive the RFP's MWBE requirement. (Def.'s SMF ¶¶ 130-32.) Ultimately, DOH reduced the requirement to 5%. (*Id.* ¶ 132.) Additionally, DOH reformulated the RFP so that an unrelated third-party would provide interim SFA services to meet the mandatory start date. (*Id.* ¶ 138.)

In the end, PCG found a third-party vendor to meet the reduced MBWE requirement and declined to give CMA the SFA subcontract. (*Id.* ¶ 132; Pl.'s SMF ¶ 143; Dkt. No. 109, Attach. 1 ¶ 132.)

## B.   Procedural History

CMA commenced this diversity action against PCG alleging breach of contract, fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and unjust enrichment and seeking not less than $1.2 million in damages. (Dkt. No. 1, Compl., ¶¶ 12-34.) Subsequently, the court dismissed CMA's fraudulent inducement claim. (Dkt. No. 17.)

Thereafter, PCG filed an answer and counterclaim against CMA alleging fraudulent inducement, breach of contract, and breach of the implied covenant of good faith and fair dealing. (Dkt. No. 19.)

Now pending before the court are both parties' motions for summary judgment. (Dkt. No. 91; Dkt. No. 93.)

### III. **Standard of Review**

The standard of review pursuant to Rule 56 of the Federal Rules of Civil Procedure is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV. **Discussion**

### A. **Breach of Contract**

The elements of a claim for breach of contract under Massachusetts law[9] are:  "(1) [a]n agreement was made between the plaintiff[] and the defendant supported by a valid consideration; (2) the plaintiff[] ha[s] been ready, willing, and able to perform; (3) the defendant's breach has prevented [the plaintiff] from performing; and (4) the plaintiff[] ha[s] suffered damages."  *Gregory v. World Sav. Bank, FSB*, Civil Action No. 11-11600, 2012 WL 3686633, at *2 (D. Mass. Aug. 22, 2012) (quoting *Singarella v. City of Boston*, 173 N.E.2d 290, 291 (Mass. 1961)).

### 1. *Existence of an Enforceable Agreement*

---

[9] The TCA expressly provides that it "is governed by the laws of the Commonwealth of Massachusetts."  (TCA § 11.)

The parties disagree over whether the TCA is an enforceable contract. (Dkt. No. 91, Attach. 3 at 1; Dkt. No. 93, Attach. 1 at 5.) As explained below, the TCA is an enforceable contract.

Under Massachusetts law, "to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000). "It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." *Id.* Although "the failure to reduce uncertainties to definite terms is fatal, particularly where parties have not yet formalized their negotiations or have left essential terms completely open," *Lafayette Place Associates v. Boston Redevelopment Authority*, 694 N.E.2d 820, 825-26 (Mass. 1998), *cert. denied*, 525 U.S. 1177 (1999), "a contract is not necessarily unenforceable because the parties agree that the details of certain of its terms shall be left to be fixed at a future time or by the happening of later events." *George W. Wilcox, Inc. v. Shell E. Petroleum Prods.*, Inc., 186 N.E. 562, 565 (Mass. 1933).

PCG's argument, that "the parties did not intend the TCA to serve as their subcontract," misses the mark.  (Dkt. No. 93, Attach. 1 at 8.)  Just because the TCA was not *the* subcontract, does not mean that it was not *a* contract.[10]  The TCA was supported by valid consideration in the form of pre-proposal submission duties outlined in TCA § 2 and post-proposal submission duties outlined in TCA § 3 and attachment A.  The parties progressed beyond the stage of imperfect negotiations when they agreed on material terms and demonstrated an intention to be bound by them. *See Situation Mgmt. Sys., Inc.*, 724 N.E. 2d at 703.

Although the court agrees with PCG that the parties have not "agreed to or contemplated binding arbitration, appraisals, options, or other automatic or third-party procedures [to further detail the subcontract's terms]," the court does not agree that the TCA provided only for subsequent negotiations.  (Dkt. No. 103 at 2.)  On the contrary, the TCA specified adequate formulae and procedures for which a subcontract would be meted out in the future.  *See Lafayette Place Assocs.*, 694

---

[10] Furthermore, PCG's argument that its actions are justified based on a prior course of dealing with CMA, specifically where CMA refused to enter a previous subcontract for a different project after agreeing on similar terms as those in the TCA, is unconvincing.  (Dkt. No. 103 at 3.)  CMA's prior conduct or legal opinion regarding an earlier, unrelated agreement is not indicative of the validity of the current agreement before the court.

N.E.2d at 826-27.  In particular, the TCA required "any resulting subcontract" to include six specified provisions substantially the same as those in the TCA and "specify a minimum CMA project participation rate of twenty percent (20%) of the total contract value."  (TCA § 3(b),(c).)  Moreover, the TCA set out a "proposed scope of work," which, although the parties agreed "to further detail . . . during the preparation of the proposal," included six specific services CMA was to provide.  (*Id.* at 6.)  Even more, the TCA erected sufficient goal posts by specifically referencing the "services described in the RFP."  (*Id.*)  These mutual obligations, the procedures identified for determining any remaining terms and conditions of the subcontract, and the specification of the work to be performed collectively demonstrate that the parties agreed to essential terms and intended to be bound by them; thus, the TCA is an enforceable contract.[11]  *See Lafayette Place Assocs.*, 694 N.E.2d at 826-27.

   2.   *Alleged Breaches of the TCA*

   CMA contends that PCG breached the TCA by failing to award it the

---

[11] The court is mindful of the provision that states, "PCG cannot make any guarantee or give any assurance that a subcontract will be entered into between PCG and CMA."  (TCA § 3(a).)  However, the very next sentence of the TCA goes on to state that, if certain conditions are met, "PCG *will* enter into a subcontract with CMA."  (*Id.* (emphasis added).)

subcontract.  (Dkt. No. 91, Attach. 3 at 8.)  Contrastingly, PCG contends

that it was excused from awarding CMA the SFA subcontract because

CMA breached first by not sharing complete and accurate information

regarding its capabilities of maintaining data warehouses and call centers.

(Dkt. No. 93, Attach. 1 at 29-30; Dkt. No. 103 at 4-5.)  Additionally, PCG

not only alleges that CMA's problematic history on the NYEIS project

prevented the conditions precedent from occurring, (Dkt. No. 93, Attach. 1

at 10-21), but also that it prevented CMA from performing and thus

prevailing on its breach of contract claim, (Dkt. No. 103 at 5).  For the

foregoing reasons, genuine issues of material fact exist as to both parties'

breach of contract claims.

### a.  PCG's Breach of Contract Claim

TCA § 2(b) required CMA to "exercise commercially reasonable

efforts to provide such assistance in the preparation and support of the

[p]roposal *as may be reasonably requested by PCG*."  (TCA § 2(b)

(emphasis added).)  Additionally, under TCA § 2(c), CMA had to "keep

[PCG] informed concerning all significant aspects of proposal

preparation."  (*Id.* § 2(c).)

The plain meaning of TCA § 2(b) is that there must first be a request

from PCG to trigger CMA's obligation. *See Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 911 (Mass. 2017). The record indicates that CMA complied with all of PCG's pre-proposal requests, (Dkt. No. 102, Attach. 1 ¶ 85; Def.'s SMF ¶¶ 85, 87, 91, 107), and PCG fails to raise the existence of a genuine dispute over whether CMA's provided estimates were inaccurate.[12] (Dkt. No. 93, Attach. 1 at 29.)

However, it is disputed whether CMA's failure to address the NYEIS problems in its discussions with PCG was a breach of TCA § 2(c). PCG claims that CMA breached TCA § 2(c) by representing that CMA had a "very strong" relationship with DOH and for failing to inform PCG that the NYEIS data warehouse and call centers continued to experience problems. (Dkt. No. 103 at 4-5; Def.'s SMF ¶¶ 33, 38-43.) CMA counters that it made no misrepresentations but rather chose to focus on its strong relationship with DOH as a whole—including other more successful DOH projects—instead of specifically with reference to NYEIS. (Dkt. No. 102, Attach. 1 ¶ 33.) CMA further contends it never stated that the NYEIS data

---

[12] Specifically, PCG fails to present sufficient evidence to controvert CMA's assertion that the figure CMA provided PCG for inclusion in the proposal was an accurate estimate of the work necessary to deliver the SFA data warehouse—despite any alleged issues with NYEIS. (Def.'s SMF ¶¶ 85, 107; Dkt. No. 102, Attach. 1 ¶ 85; Dkt. No. 109, Attach. 1 ¶ 85.)

warehouse and call center were in use or without issue, or that DOH was satisfied with all aspects of their relationship. (*Id.* ¶ 43.)

Despite the fact that PCG was informed about the problems with the NYEIS project, (Pl.'s SMF ¶¶ 41, 76; Dkt. No. 102, Attach. 29), whether any statements made by CMA during the February teleconference reasonably led PCG to believe that all the issues with the NYEIS project were solved is in dispute, (Def.'s SMF ¶ 53; Dkt. No. 102, Attach. 1 ¶ 53).

Given these disputed factual issues, neither party has met its burden to obtain summary judgment as to PCG's breach of contract claim.

### b.    *CMA's Breach of Contract Claim*

TCA § 3(a) provided that PCG would enter into a subcontract with CMA "if CMA can meet all necessary requirements for a subcontract, including but not limited to satisfying PCG's standard requirements for subcontractors and obtaining any necessary approval by [DOH]."[13]  (TCA § 3(a).)  CMA claims that DOH approval was unnecessary and PCG does not have "standard requirements for subcontractors." (Dkt. No. 91, Attach. 3 at 4.)  PCG argues that neither of the specified condition precedents

---

[13] An additional condition precedent—that DOH award the SFA contract to PCG—is not discussed because the parties agree that the condition was met.  (Pl.'s SMF ¶ 118; Def.'s SMF ¶ 24.)

were satisfied and, in any event, CMA's "performance deficiencies" did not satisfy other necessary requirements not specifically listed in the TCA. (Dkt. No. 93, Attach. 1 at 16-20.)

### (i)  DOH Approval

The first issue is whether DOH's expressed concerns about CMA's proposed role on the SFA project meant that CMA did not have its approval or whether DOH considered CMA an approved and qualified subcontractor even in the face of its misgivings.  (Dkt. No. 93, Attach. 1 at 17-18; Dkt. No. 91, Attach. 3 at 6.)

"If a contract . . . is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment." *Seaco Ins. Co. v. Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002).  When a contract's language is clear, it alone determines the contract's meaning and must be construed according to its plain meaning.  *See Balles*, 70 N.E.3d at 911.  "Justice, common sense and the probable intention of the parties are guides to construction of a written instrument."  *Stop & Shop, Inc. v. Ganem*, 200 N.E.2d 248, 251 (Mass. 1964).  Additionally, the court must "construe [the] contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose."  *MCI*

*WorldCom Commc'ns, Inc. v. Dep't of Telecomms. & Energy*, 810 N.E.2d 802, 810 (Mass. 2004).

The meaning of the language "obtaining any necessary approval by the [p]rospective [c]lient" is unambiguous.  (TCA § 3(a).)  Therefore, the court construes that language according to its plain meaning.  *See Balles*, 70 N.E.3d at 911.  It is clear that the prospective client was DOH.  "Necessary" means "absolutely needed," *see* Necessary, *Merriam–Webster's Collegiate Dictionary* (10th ed.1997), and  "approval" means the act of giving official sanction, *see* Approval*, Merriam–Webster's Collegiate Dictionary*.  The context of the TCA as a whole also reveals that the contract was designed to insure that the parties worked together to submit a proposal and, if selected, lay out the necessary structure for CMA to participate in the project to a tune of at least 20% of the contract value.  (*See generally* TCA.)  DOH's acceptance of the SFA proposal was the only "official sanction" that was "absolutely necessary" to effectuate the intentions of the parties.  The parties' proposal clearly identified CMA as the anticipated subcontractor and explained the anticipated role that CMA would play if DOH awarded PCG the project.  (Dkt. No. 93, Attach. 9 at 3, 7-8, 71, 79-80, 268, 377-78.)

After careful review, DOH chose their proposal.  (Def.'s SMF ¶ 111.)

Despite the views expressed by one DOH official, the state agency

affirmatively refused to issue any official statement that it did not sanction

CMA as a subcontractor.  (*Id.* ¶ 134; Pl.'s SMF ¶¶ 135-36.)  In fact, DOH

had previously issued an official opinion that CMA would not be limited

from subcontracting on the SFA project.  (Pl.'s SMF ¶ 137.)

As such, no reasonable juror could find that CMA did not receive the

"necessary approval" under TCA § 3(a).


### (ii)    PCG's Standard Requirements for Subcontractors

Whether CMA satisfied "PCG's standard requirements for

subcontractors" under TCA § 3(a) is not as clear.

PCG argues that "[g]iven what []DOH told PCG about CMA's lack of

reliability, deficient performance, and inability to fix issues, CMA failed to

meet PCG's standard requirements for contractors."  (Dkt. No. 103 at 9.)

PCG contends that these standard requirements are laid out in a

subcontractor due diligence protocol, and—although not referenced

specifically in the TCA—CMA understood them from the parties' previous

course of dealings.  (*Id.* at 7.)  On its end, CMA argues that PCG's

"standard requirements for contractors" do not exist because there is no document in existence entitled "standard requirements for subcontractors." (Dkt. No. 91, Attach. 3 at 4.) CMA buttresses this stance by pointing out PCG's varying definitions of such standards and arguing that the subcontractor due diligence protocol is a questionnaire incapable of defining PCG's standard requirements. (*Id.*; Dkt. No. 102, Attach. 38 at 17-18.) CMA also argues that this term was never defined during the TCA negotiations, and thus "the term has no meaning for purposes of this litigation[.]" (Dkt. No. 91, Attach. 3 at 5.)

Under Massachusetts law, where a contract "has terms that are ambiguous, uncertain, or equivocal in meaning, the intent of the parties is a question of fact to be determined at trial." *Seaco Ins. Co*, 761 N.E.2d at 951. "Contractual language is ambiguous when it can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." *Balles*, 70 N.E.3d at 911 (internal quotations marks and citation omitted). If a contract's terms are ambiguous on their face, a court may consider extrinsic evidence to extract their meaning. *See EventMonitor, Inc. v. Leness*, 44 N.E.3d 848, 856 (Mass. 2016). However, if a genuine dispute of material fact remains,

the contract's meaning must be "discerned by the factfinder from the circumstances surrounding the ambiguity and from such reasonable inferences as may be available." *Lanier Prof'l Servs., Inc. v. Ricci*, 192 F.3d 1, 4 (1st Cir. 1999) (applying Mass. law).

As indicated by both of the parties' arguments, the "standard requirements" provision presents a reasonable difference of opinion as to its meaning.[14]  *See Balles*, 70 N.E.3d at 911.  PCG's director of business strategy, despite being aware of the subcontractor due diligence protocol, could not even clearly identify what these standard requirements were. (Dkt. No. 102, Attach. 38 at 18; Dkt. No. 109 at 3, n.17.)  Further, any reference to PCG's subcontractor due diligence protocol is notably absent from the TCA.  Upon examination of the subcontractor due diligence protocol, it appears merely to provide guidance to PCG employees when dealing with potential subcontractors; however, it hardly identifies PCG's

---

[14] CMA argues that any ambiguous language should be construed against PCG.  (Dkt. No. 108 at 10.)  Although uncertainties in an instrument may be construed against the drafter, such a construction is "a default rule that arguably has more force where the parties differ in sophistication or where standard forms are used."  *Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort and Spa*, 388 F.3d 15, 18 (1st Cir. 2004) (applying Mass. law); *see Boston Ins. Co. v. Fawcett*, 258 N.E.2d 771, 776 (Mass. 1970) (refusing to construe a contract against its drafter where parties negotiated contractual terms as equals).  Here, the record demonstrates that both parties stand on equal footing in terms of business sophistication and dealt with one another at arm's length.  Both parties agree that drafting the TCA was a joint endeavor. (Def.'s SMF ¶ 70.)  Therefore, the court declines to construe ambiguous language against either party.

standard requirements with reasonable clarity.  (Dkt. No. 93, Attach. 31.)

In particular, the document does not elaborate on what would satisfy

PCG's standard requirements because there are no answers to the

questions posed or other point scale to aid in determining this standard or

whether it was met.  (*Id.*)  Moreover, PCG does not present indisputable

evidence that the subcontractor due diligence protocol was even

completed for CMA.  (Dkt. No. 102, Attach. 38 at 18.)

Since the extrinsic evidenced presented by PCG does not resolve

the ambiguity and CMA fails to present a plausible definition of its own, it

is the role of the fact finder to determine what PCG's "standard

requirements for contractors" actually meant and whether this condition

precedent was satisfied.

(iii)    *"Including but not limited to"*

On top of its other contentions, PCG argues that—even if the court

determines that the specified conditions precedent were satisfied—PCG

did not breach the TCA because CMA failed to meet other, unlisted

requirements.  (Dkt. No. 103 at 11.)  It contends that "[t]he examples in

[s]ection 3(a) of the TCA illustrate that PCG had no obligation to negotiate

a subcontract if CMA performed inadequately for, and lacked the

confidence of, []DOH[.]" (*Id.*)  CMA counters that the "including but not limited to" language is ambiguous, and PCG's interpretation is unreasonable, because "[a] clause such as the one suggested by PCG would give PCG an unfettered right to cancel the TCA . . . based on its own whims and predilections."  (Dkt. No. 102, Attach. 38 at 20-21.)

To be sure, the contractual phrase "including but not limited to" renders the listed categories illustrative but not exhaustive.  *See Blais v. Hartford Fire Ins. Co.*, Civil Action No. 08-40221-FDS, 2011 WL 1303135, at *10 (D. Mass. Mar. 30, 2011) (applying Mass. law).  It would be irrational to conclude that the definition of "all necessary requirements" was intended to cover anything that PCG claimed it required down the road, but it would contradict the express terms of the TCA to hold that it covered only the specific types of requirements given as examples.  *See id.*  Thus, the definition of "necessary requirements" must be "somewhere between the narrowest possible interpretation . . . and the broadest possible interpretation."  *Id.*  However, there is nothing in the language of the TCA that adequately describes where that definition lies.  As such, the phrase "including but not limited to" is also ambiguous, and the fact finder will have to determine its meaning.

For the aforementioned reasons, all motions for summary judgment submitted in regards to an alleged breach of contract are denied.

## B.   <u>Implied Covenant of Good Faith and Fair Dealing</u>

Next, both parties argue that the other breached the implied covenant of good faith and fair dealing.

It is bedrock Massachusetts law that every contract is subject to an implied covenant of good faith and fair dealing.  *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 821 (Mass. 1991).  "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance."  *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (applying Mass. law). A breach of this covenant thus requires a lack of good faith, which can be inferred based on evidence that a party's actions are unreasonable under the circumstances.  *See Nile v. Nile*, 734 N.E.2d 1153, 1160 (Mass. 2000).  Where contract terms grant one party discretion, the implied covenant limits the exercise of that discretion.  *See McAdams v. Mass. Mut. Life Ins. Co.*, 391 F.3d 287, 301 (1st Cir. 2004) (applying Mass. law).

*1.    CMA's Claim*[15]

CMA argues that PCG demonstrated a lack of good faith when it "'pounced' at the opportunity to exclude CMA as soon as it learned that the [MWBE] percentage was a goal and not a requirement[.]"  (Dkt. No. 91, Attach. 3 at 9.)  PCG responds that it could not have violated the reasonable expectations of CMA by not entering a subcontract with it because the TCA's conditions precedent were not satisfied.  (Dkt. No. 103 at 13; Dkt. No. 93, Attach. 1 at 16-20.)  As such, PCG opposes CMA's motion for summary judgment.  (Dkt. No. 103 at 26-29.)  However, although PCG noticed its motion as seeking summary judgment on all CMA's claims, it makes no affirmative arguments for summary judgment on CMA's implied covenant claim.

A party asserting that a material fact cannot be disputed must cite to particular parts of the record or show that the materials cited do not establish the presence of a genuine dispute and that, as such, they are

---

[15] The court considered PCG's overarching argument that the affidavits of Gary Davis and John Kazunas are "sham affidavits."  (Dkt. No. 103, Attach. 1 at 1-3; Dkt. No. 109, Attach. 1 at 1-5.)  However, after reviewing both documents and comparing them with other materials in the record, it appears that any discrepancies relate to either inconsequential hair-splitting or newly-remembered facts pertaining to the February teleconference.  Even without the two affidavits, the record is of enough depth to allow for CMA's claims to survive summary judgment.  In the event that there are any prior inconsistent statements involved between depositions and later testimony, the parties can address them at trial.

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; N.D.N.Y. L.R. 7.1(a)(3).  Given that CMA supports its claim only by relying on an immaterial fact—an internal PCG email that indicates a PCG official "pounced on" DOH's unfavorable assessment—CMA fails to sufficiently demonstrate that PCG's actions were demonstrative of a lack of good faith.  Examining the evidence in the light most favorable to PCG as the non-moving party, a sole email indicating that PCG quickly responded to DOH's unfavorable review of CMA is not indicative of a lack of good faith. Assuming that CMA breached its pre-proposal duties under TCA § 2(c) or failed to satisfy the necessary standards for subcontractors under TCA § 3(a), it could be reasonably inferred that PCG exercised good faith when it declined to enter into a subcontract with CMA after the kickoff meeting. (Def.'s SMF ¶¶ 111-12, 116-21.)

As such, the court denies both motions for summary judgment on CMA's breach of the implied covenant claim.

### 2.    PCG's Claim

Along the same lines, PCG does not satisfy the summary judgment standard regarding its breach of the implied covenant counterclaim.  PCG simply states that "[t]he implied covenant of good faith and fair dealing

required CMA to perform its contractual duties, including its duty to provide PCG with information under § 2(b)—honestly, and without destroying or injuring the right of [PCG] to receive the fruits of the contract." (Dkt. No. 93, Attach. 1 at 29 (footnote omitted) (internal quotation marks and citation omitted).) For the above-mentioned reasons, this bare legal assertion is not enough to satisfy the mandates of Rule 56; thus, PCG's motion for summary judgment on its counterclaim is denied.

At the same time, CMA moves for summary judgment on PCG's counterclaim based on its argument that the implied covenant cannot create additional rights or duties other than those outlined in the contract and, because PCG's allegations mirror its breach of contract claims, there is "no independent cause of action for a breach of the covenant."[16] (Dkt. No. 91, Attach. 3 at 28.) For its part, PCG argues that CMA acted in bad faith when it "lied about its relationship with []DOH and provided bid content misrepresenting its work and the status of NYEIS." (Dkt. No. 103

_____

[16] Although "claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage," (*Christensen v. Kingston Sch. Comm.*, 360 F.Supp. 2d 212, 229 (D. Mass. 2005) (applying Mass. law), viewing PCG's assertions in the most favorable light, it can be reasonably inferred that CMA attempted to mislead PCG into entering a subcontract that would provide CMA with undue economic advantage.

at 15, 26-28.)

It is unnecessary to get into the heart of the parties arguments in this regard because PCG's claim rests on reasonable inferences to be made by the fact finder. For instance, the fact finder may reasonably infer that CMA's performance of its obligations under TCA § 2(c) was unreasonable under the circumstances. *See Nile*, 734 N.E.2d at 1160. Therefore, CMA's motion with respect to PCG's claim of breach of the implied covenant of good faith and fair dealing is also denied.

## C.    Unjust Enrichment

PCG also moves for summary judgment on CMA's claim of unjust enrichment and argues that, if a contract governs the parties' relationship, the contract provides an adequate remedy at law. (Dkt. No. 93, Attach. 1 at 21-23.) CMA is silent on this point.

Indeed, it is well-settled that "a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties." *Metro. Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 849 (Mass. 2013) (internal quotation marks and citation omitted). Moreover, "[w]here a properly filed motion is unopposed and the [c]ourt determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein,

the non-moving party's failure to file or serve any papers as [the court's Local Rules of Practice] require[] shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."  N.D.N.Y. L.R. 7.1(b)(3).

Since CMA failed to respond to PCG's argument and the TCA is a contract that provides an adequate remedy at law, PCG's motion for summary judgment on CMA's unjust enrichment claim is granted and the claim is dismissed.

**D.    <u>Fraudulent Inducement</u>**

*1.    Applicable Law*

CMA and PCG each claim that they are entitled to summary judgment on PCG's fraudulent inducement counterclaim, but argue over which state's law applies.  PCG contends that Massachusetts law applies because "the injury was suffered in Massachusetts, most participants to the February 8, 2013 call were in Massachusetts, and CMA's proposal materials were received in Massachusetts."  (Dkt. No. 109 at 10, n.49.)  On the other hand, CMA contends that New York law applies because "the claim involves a conduct-regulating tort that allegedly occurred in New

York and New York has an interest in applying New York law."[17]  (Dkt. No. 108 at 9 (footnote omitted).)

Generally, courts will honor a contract's express choice of law provision unless there is an allegation of fraud.  *Aramarine Brokerage, Inc. v. OneBeacon Ins. Co.*, 307 F. App'x 562, 564 (2d Cir. 2009).  Under New York law, such tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract.  *See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005); *G.L.M. Sec. & Sound, Inc. v. LoJack Corp.*, No. 10-CV-04701, 2011 WL 4594825, at *4 (E.D.N.Y. Sept. 30, 2011), *on reconsideration in part*, No. 10-CV-4701, 2012 WL 4512499 (E.D.N.Y. Sept. 28, 2012).

New York courts implement an "interest analysis" to determine which law applies.  *See GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006).  "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will

---

[17] It appears that CMA favors New York law because it would preclude PCG from recovery under the "out-of-pocket" rule, "which bars recovery of profits that would have been realized in the absence of fraud . . . as inherently speculative and undeterminable."  *Geary v. Hunton & Williams*, 257 A.D.2d 482, 482 (1st Dep't 1999).

generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993). A fraudulent tort "arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally, the plaintiff's residence." *G.L.M.*, 2011 WL 4594825 at *6 (internal quotation marks and citation omitted).

For the reasons explained in *G.L.M.*—namely, that an actual conflict exists, fraudulent inducement is a conduct-regulating tort, and the alleged injury was felt in Massachusetts where PCG is domiciled—Massachusetts law applies to PCG's claim under the appropriate choice of law analysis. *See id.* at *5-6.

2.    *Analysis*

To establish fraud in the inducement, a party must "establish the elements of common law deceit, . . . which include [1] misrepresentation of a material fact, [2] made to induce action, and [3] reasonable reliance on the [4] false statement [5] to the detriment of the person relying." *Commerce Bank & Tr. Co. v. Hayeck*, 709 N.E.2d 1122, 1126 (Mass. App. Ct. 1999) (internal quotation marks and citation omitted).

PCG's claim centers around the February teleconference held before the parties entered the TCA.  PCG argues that CMA employees misled PCG into thinking that all the NYEIS data warehouse issues had been solved, and that DOH was not only using the data warehouse but was satisfied with its functioning.  (Dkt. No. 103 at 16-17.)  PCG further argues that it relied on these misrepresentations when entering the TCA and later when negotiating "costs and deliverables that were out of step with the work that would be necessary to complete the project."  (Dkt. No. 93, Attach. 1 at 28.)  On its end, CMA denies that any of its employees made such statements.  (Dkt. No. 91, Attach. 3 at 13.)  CMA further disputes whether any of the alleged statements, even if made, were false. (*Id.* at 14.)

It is apparent that there are issues of fact, which preclude summary judgment, namely whether any statements made by CMA were false misrepresentations of material facts, made to induce action, or reasonably relied on by PCG.  *See Commerce Bank & Tr. Co.*, 709 N.E.2d at 1126. As such, the court denies both parties' motions for summary judgment on this claim.

### E.  CMA's Request to Preclude Expert Testimony

Lastly, embedded in its motion for summary judgment, CMA moves to preclude PCG's expert witness from testifying at trial pursuant to Rule 702 of the Federal Rules of Evidence.  (Dkt. No. 91, Attach. 3 at 29-30.) CMA relies on the affidavit of Marianne DeMario to support its request. (*Id.*)  PCG objects to CMA's "motion to strike" the expert testimony and requests that the court strike the DeMario affidavit.  (Dkt. No. 104 at 1.)

CMA's motion is denied with leave to renew through an appropriate motion at a later time.[18]  PCG's motion to strike, (Dkt. No. 104), is denied as moot.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that CMA's motion for summary judgment (Dkt. No. 91) is **DENIED**; and it is further

---

[18] In any event, since the parties have requested a bench trial, the court is not inclined to preclude any expert testimony at this stage.  *See United States v. Am. Express Co.*, No. 10–CV–4496, 2014 WL 2879811, at *2 (E.D.N.Y. June 24, 2014) ("[T]he *Daubert* dynamic is slightly altered in a bench trial as there is little risk that the factfinder will be 'bamboozled' by technical evidence of questionable merit.") (internal quotation marks and citation omitted); *see also Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, No. 07 Civ. 5804, 2009 WL 959775, at *6, n.3 (S.D.N.Y. Apr. 8, 2009) ("[W]here a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence[.]").

**ORDERED** that CMA's motion to preclude expert testimony (Dkt. No. 91) is **DENIED with leave to renew**; and it is further

**ORDERED** that PCG's motion for summary judgment (Dkt. No. 93) is **GRANTED IN PART AND DENIED IN PART** as follows: **GRANTED** with respect to CMA's unjust enrichment claim; and **DENIED** in all other respects; and it is further

**ORDERED** that PCG's motion to strike (Dkt. No. 104) is **DENIED as moot**; and it is further

**ORDERED** that this case is deemed trial ready and a scheduling order shall issue in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

October 24, 2017
Albany, New York

Gary L. Sharpe
U.S. District Judge